SECURITIES MORTGAGE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5153–69.    Filed July 24 ,1972.

*Andrew M. Williams* and *Alvord B. Rutherford*, for the petitioner.
*Eugene H. Flood*, for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency of $175,620 in the petitioner's Federal income tax for the year ending November 30, 1966. The issues to be decided are whether a mortgagee may deduct its loss on the foreclosure of property in the year of the foreclosure sale or in the year in which the redemption rights expire, what burden is placed on the mortgagee to prove the fair market value of property acquired at the foreclosure sale, and what formula is to be used to determine the fair market value of an incomplete apartment project.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Securities Mortgage Co., had its principal place of business in Seattle, Wash., at the time of the filing of its petition in this case. It filed its Federal corporate income tax return for the year ending November 30, 1966, with the district director of internal revenue, Tacoma, Wash. A taxable or fiscal year of the petitioner will be identified by the calendar year in which it ends.

The petitioner was a Washington corporation engaged in the mortgage loan business. As part of that business, it made construction loans to apartment builders and received interest-bearing notes and mortgages on the apartments and the land on which the apartments were being built as security. In 1966, two such mortgages were foreclosed, and the properties were sold at sheriff's sales. At one sale, the uncompleted Tacoma Mall Apartments (Tacoma Mall) were sold to a

nominee of the petitioner, and at the other, the uncompleted Terri Ann Apartments (Terri Ann) were sold directly to the petitioner. In 1967, the petitioner was liquidated, and its assets transferred to a subsidiary of the Seattle First National Bank.

The petitioner first became involved with Tacoma Mall in 1962 when it agreed to loan to the Alpine Development Co., Inc. (Alpine), $350,-000 for the construction of a 48-unit apartment complex. As security for the advances to be made under the loan, the petitioner received a note for $350,000 and a mortgage. The note was signed by Alpine and the three principal shareholders of Alpine and their wives individually, and the mortgaged property, in its completed state, was expected to have a value of $560,000. The loan was payable in full on August 1, 1963, and was in default on and after that date.

On August 29, 1963, the petitioner discontinued making advances because it had become apparent that Alpine was in financial difficulty. As of that date, the petitioner had advanced approximately $260,000 of the $350,000 loan; $50,000 had been advanced for the purchase of the land on which Tacoma Mall was to be constructed; approximately $20,000, to clear title, to pay fees, commissions, and insurance premiums; and $190,500, for the purpose of construction. Some part of these advances was diverted from Tacoma Mall to another project which Alpine was developing, and $15,000 of the $50,000 purchase price of the land was never paid by Alpine. At the time that the advances were discontinued, the site had been cleared and prepared, and approximately 25 percent of the physical building completed.

During the period from August 29, 1963, to November 1964, the Tacoma Mall buildings remained exposed to the elements and suffered damages. On November 10, 1964, Alpine contracted with the Rudy Simone Construction Co., Inc. (Simone), regarding the performance of work which would weatherproof the 40 units which had been erected. On the same day, the balance of the $350,000 loan, or $84,336.49, was placed in escrow by the petitioner to pay Simone for its work.

Mr. Simone had inspected the buildings, found them to be in poor condition, and had consulted both a structural engineer and a testing laboratory. Following the recommendations of the engineer and the testing laboratory, Simone finished the roof, framed and added doors, installed windows, added the brick facing and stucco exterior to the buildings, and generally weatherproofed the buildings. About 20 to 25 percent of the approximately $80,000 paid to Simone was spent to correct defects in construction and to remove or repair damage on account of weather. In January 1965, Mr. Simone estimated that it would cost $231,000 to complete Tacoma Mall as a 40-unit complex. However, no other work was done on Tacoma Mall until after the sheriff's sale in 1966.

On April 21, 1965, the petitioner borrowed $250,000 from Alex Shulman and gave the Tacoma Mall mortgage and note as security. On May 5, 1965, Mr. Shulman, acting as the nominee of the petitioner, brought suit to foreclose the mortgage, and on February 14, 1966, judgment was awarded to him in the amount of $348,166.99 plus interest, costs, and fees. On April 15, 1966, Tacoma Mall was sold at a sheriff's sale to Mr. Shulman, the only bidder, for $435,871.69.

At the time of the sheriff's sale, the petitioner's claim against Alpine amounted to $460,622.69. It wished to secure a deficiency judgment against Alpine and its shareholders in order to secure their cooperation with respect to such matters as redemption rights, and for that reason, it did not bid the entire amount of its claim at the foreclosure sale— it left $24,751 for which it secured a deficiency judgment. Under Washington law, a mortgagee in possession of property secured at a foreclosure sale is not entitled to reimbursement for the costs of improvements which it makes on the property, and since it appeared that the petitioner might have to complete Tacoma Mall, it decided to bid the entire amount of its remaining claim against Alpine at the foreclosure sale in order to protect its interest in the expected work on the buildings. Under Washington law, the petitioner acquired a lien on Tacoma Mall, not legal title, as a result of its purchase at the sheriff's sale.

. The judgment and decree of foreclosure listed nine redemptioners and the period of redemption extended until April 1967. The judgments held by the redemptioners ranged in amount from $200 to $25,000. Three of the redemptioners (Metropolitan Mortgage Co., Inc., Fisher Construction Co., and George Scofield Co.) affirmatively decided not to exercise their rights. Three others redemptioners (Freda M. Quesnel, Louise F. Shaffrath, and Properties Unlimited, Inc.) had limited financial resources and could not have raised the over $450,000 required to redeem the Tacoma Mall property. Another redemptioner did not understand the nature of his redemption rights but would not have paid $450,000 to exercise them. Finally, two redemptioners, Alpine and Bunce Rental, Inc., transferred their rights to affiliates of the petitioner. The majority shareholders of Alpine sold 75 percent of Alpine's stock to the petitioner in exchange for a reduction of the deficiency judgment against them in the amount of $10,000; thereafter, Alpine executed and delivered to Investors Insurance Agency, Inc., a quitclaim deed of all its interest in Tacoma Mall. Bunce Rental, Inc., assigned its judgment to the Homestead Co. That company notified the sheriff of its intention to redeem the property, but it never perfected the redemption. All of the stock of both the Investors Insurance Agency, Inc., and the Homestead Co. was owned by the same shareholders as owned all of the stock of the petitioner.

Following the sheriff's sale, the petitioner offered the property for sale in its unfinished state for approximately $300,000. No buyer was interested, and the petitioner decided to have the construction completed itself. On June 24, 1966, Mr. Simone estimated that it would cost $324,170 exclusive of sales tax to complete the 40 units. The increase from the January 1965 estimate was mainly due to the additional requirements which were either imposed by the Tacoma building department or suggested by the structural engineer who had inspected the property. In September 1966, in part due to certain changes requested by the petitioner, the estimate was increased to $365,267. Simone began construction in the fall of 1966, and a formal contract was executed on January 24, 1967. The contract, which was based on figures given to the petitioner by Simone in December 1966, provided that Simone was to be paid a total of $369,000. In order to protect against the possibility of redemption, the contract also provided that only $250,000 of the work was to be done before April 15, 1967.

About June 1967, the work was completed in substantial conformance with the architectural plans as they existed at the time of the foreclosure sale, and the apartments were ready for occupancy. As a result of miscellaneous change orders, the amount actually paid Simone including sales tax was $380,202.10. The total cost incurred after the sheriff's sale in completing Tacoma Mall as a 40-unit apartment complex included such items as the payments to Simone, architect and engineering fees, and amounts expended for furnishings, insurance, landscaping, and taxes, and amounted to $407,164.78.

In January 1967, with its liquidation impending, the petitioner believed it important to sell Tacoma Mall. Therefore, on January 25, 1967, the petitioner, after having refused to sell Tacoma Mall to Alex Shulman for $450,000, sold it to him for $525,000, subject to both the satisfactory completion of construction and an option in Mr. Shulman to require the petitioner to buy back the property for $535,000. While Mr. Shulman owned the property, it was offered for sale at $600,000 with a $150,000 downpayment and offers to buy the property of $425,000, $450,000, and $462,500 were received. In January 1969, Mr. Shulman exercised his option, and the property was bought back by Northwest Associates, a partnership to which the real estate contract with Mr. Shulman had been assigned. The partnership still owns and operates Tacoma Mall. At the time of trial, it was offering Tacoma Mall for sale at $525,000. The petitioner's expert witness found that the fair market value of Tacoma Mall at the time of the sheriff's sale was $71,500.

On its Federal income tax return for 1966, the petitioner claimed a bad debt deduction of $230,000 attributable to the Tacoma Mall sheriff's sale. In his notice of deficiency, the respondent took the position that the petitioner had not suffered a loss because it had bid in the property for an amount in excess of the debt and because it did not acquire an indefeasible title to the property in 1966. With the petitioner conceding that certain legal expenses may be treated as capital expenditures, it is agreed by the parties that at the time of the sheriff's sale, the petitioner's basis in the debt was $366,524.45.

On August 3, 1962, the petitioner agreed to lend Terri Ann Corp. $200,000 for the construction of a 25-unit, 8-story apartment building known as the Terri Ann Apartments. The apartments were to be situated on a very good, close-in, downtown Seattle, Wash., location, but the land had a steep incline which made construction difficult. As security for advances to be made under the construction loan, the petitioner received a mortgage and a $200,000 note signed by the Terri Ann Corp. and two of its shareholders individually. The corporation was to provide the other $110,000 in materials and money needed to complete the apartments, and it was estimated that the completed apartments would be worth approximately $310,000.

The $200,000 was advanced in installments over a period from August 3, 1962, to April 1963. The loan was in default on and after May 1, 1963, and construction stopped at about that time. The building was then approximately 65-percent completed. The roof and exterior sheathing were on the building but not completed, the interior studs were in place, the rough wiring and rough plumbing were completed, and the insulation and much or all of the plasterboard were in place.

During the period from April 1963 to early 1966, Terri Ann was frequently invaded by vandals, who broke doors and windows and deposited refuse in the building. In January 1965, Mr. Simone estimated that it would cost $134,606 plus sales tax to complete the building. However, no work was done in 1965, and during the time before the sheriff's sale, water entered part of the building, moss was growing inside the lower portion of the building, and a small amount of studs and flooring had warped.

After having made substantial but unsuccessful efforts to avoid foreclosure, the petitioner brought suit, and on January 10, 1966, obtained judgment for $200,000 plus interest, costs, and fees, and a decree foreclosing the mortgage and ordering the property sold. On February 18, 1966, the Terri Ann Apartments were sold at the sheriff's sale to the petitioner for $272,196.62. The petitioner bid the entire amount to which it was entitled under its judgment in order to protect rights to

the improvements which it expected to make in the building. At the sheriff's sale, it merely acquired a lien on the property. The petitioner did not retain a deficiency judgment because it believed that such a judgment would be uncollectible. Because a deficiency judgment was waived, the period of redemption was only 8 months.

Following the sheriff's sale, the petitioner first made a substantial but unsuccessful effort to sell Terri Ann in its incomplete condition. It then undertook to complete the building. In August 1966, bids were taken for the completion of the construction of Terri Ann. Simone's bid of $149,175 plus sales tax was low; the bid did not include the cost of repairing the damage which had occurred to the building since it had been first constructed. As a result of various change orders, the amount actually paid Simone, including $7,261.70 in sales tax, was $180,159.35. The total cost of completing Terri Ann incurred after the sheriff's sale including the payments made to Simone and such items as amounts expended for furnishings, a television antenna, attorney fees, architect fees, and taxes was $201,667.60. By February 1967, the apartments were completed in substantial conformance with the architectural plans as they existed at the time of the foreclosure sale and were ready for occupancy.

For the purpose of establishing a price at which to offer the completed building, the petitioner, in November 1966, had estimated its value to be $365,000. In that same month, the petitioner received offers to purchase the property when completed for $350,000 with a $50,000 downpayment, $365,000 with a $50,000 downpayment, and $350,000 with a $65,000 downpayment. Toward the end of 1967, offers of $315,000 and $310,000, net of sale expenses, were made to purchase Terri Ann and an adjacent lot that the petitioner had bought for $35,000. During 1967, $300,000 of insurance was carried on the apartment building. At the time of trial, Terri Ann was being offered for sale at $325,000, and no offers to purchase at that price had been received. The petitioner's expert witness found the fair market value of Terri Ann at the time of the sheriff's sale to be $120,000.

On its Federal income tax return for 1966, the petitioner claimed a bad debt loss of $60,000 attributable to the Terri Ann sheriff's sale. In his notice of deficiency, the respondent determined that the petitioner had not shown by clear and convincing proof that the fair market value of the property was less than the amount bid at the sheriff's sale and that the petitioner realized a gain of $57,582.61 upon the foreclosure, as the value of the property was in excess of the petitioner's basis in the mortgage debt. With the petitioner conceding that certain legal fees may be treated as capital expenditures, the parties agree that the petitioner's basis in the debt at the time of the sale was $214,614.01.

OPINION

With respect to the foreclosure of the mortgage on Tacoma Mall, the issues are whether the petitioner suffered a loss and if so, whether the loss was deductible in 1966, the year of the foreclosure sale, or in 1967, when the redemption rights expired. With respect to the foreclosure of the mortgage on Terri Ann, the only issue is whether the petitioner suffered a loss.

The petitioner contends that under section 1.166–6(b)(1) of the Income Tax Regulations, the Tacoma Mall loss was deductible in 1966; that by clear and convincing evidence it has shown that the fair market value of Tacoma Mall was lower than the bid price of the property; and that by a preponderance of the evidence, it has shown the fair market value of Tacoma Mall to be $75,000 at the time of the foreclosure sale. The petitioner further contends that by clear and convincing evidence it has shown that the fair market value of Terri Ann was lower than the bid price of the property and that by a preponderance of the evidence, it has shown the fair market value of Terri Ann to be $100,000 at the time of the foreclosure sale.

The respondent argues that the Tacoma Mall loss was not deductible in 1966 because redemption rights were still outstanding; that the fair market value of Tacoma Mall at the time of its foreclosure sale was not less than $250,000; and that the petitioner has failed to show that the fair market value of Terri Ann was not the bid price.

Section 1.166–6(b)(1) of the Income Tax Regulations provides that in the case of a foreclosure sale, if:

the creditor buys in the mortgaged * * * property, loss or gain is * * * realized, measured by the difference between the amount of those obligations of the debtor which are applied to the purchase or bid price * * * and the fair market value of the property.

In *Hadley Falls Trust Co.* v. *United States*, 110 F. 2d 887 (C.A. 1, 1940), the court considered the predecessor of this regulation and concluded that it was within the Commissioner's power to make the foreclosure sale the event for ascertaining whether a mortgagee has realized a gain or loss. In so holding, the court stated that because a foreclosure sale involves the transfer of a debt asset for a property asset, it was not unreasonable to treat the sale as resulting in gain or loss which should be recognized for tax purposes. *Hadley Falls Trust Co.* v. *United States, supra* at 891. At the 1966 foreclosure sale of Tacoma Mall, the petitioner exchanged a debt asset for a property asset. See *Nelson* v. *Lanza*, 18 Wash. 2d 167, 138 P. 2d 667 (1943). Thus, based on both the language of the regulation and the reasoning of *Hadley Falls Trust Co.*, we hold that the Tacoma Mall loss was deductible in 1966.

The reasons for allowing the deduction in the year of the foreclosure sale are especially persuasive in this case; in economic reality, there was no chance that the redemption rights would be exercised by anyone holding an interest adverse to the petitioner. At the time of the sale, the largest judgment held by any redemptioner was $25,000 and with the difference between the bid price and fair market value being in excess of $330,000 (see p. 678 *infra*), no redemptioner was likely to exercise his rights. Furthermore, the petitioner adopted a plan under which only $250,000 of work was to be done on Tacoma Mall during the redemption period so that at the end of the period the difference between the bid price with interest and the value of the property would still be substantial. The petitioner also owned 75 percent of the stock of Alpine and could effectively prevent the exercise of its rights. It arranged to have Alpine's rights transferred to a corporation, which was owned by the same shareholders as owned the petitioner. As additional protection, another corporation related to the petitioner acquired the rights of one of the redemptioners; by exercising such rights, the petitioner could force the other redemptioners to exercise their rights within 60 days or forfeit such rights. Wash. Rev. Code Ann. sec. 6.24.150. The affiliate never exercised its rights because there was never any need to do so. Indeed, three such redemptioners, at the time of or before the sale, decided not to exercise their rights, three could not have raised the funds necessary to redeem the property, and one testified that even if he had understood the nature of his rights, he would not have exercised them.

The respondent relied upon a line of cases holding that a mortgagor cannot claim a loss until the redemption period expires (see *Sherwin A. Hill, Administrator*, 40 B.T.A. 376 (1939) ; *Derby Realty Corporation*, 35 B.T.A. 335 (1937) ; *J. C. Hawkins*, 34 B.T.A. 918 (1936), affd. 91 F. 2d 354 (C.A. 5, 1937)) ; and G.C.M. 19573, 1938–1 C.B. 214, holding that such cases are also applicable for determining when a mortgagee must recognize gain or loss. However, this Court has stated that such cases are not determinative in the mortgagee situation (*William C. Heinemann & Co.*, 40 B.T.A. 1090 (1939)), and G.C.M. 19573 has been declared obsolete by Rev. Rul. 69–31, 1969–1 C.B. 307. The respondent also cited *Abernathy Jr.* v. *Patterson*, an unreported case (N.D. Ala. 1963, 12 A.F.T.R. 2d 5179, 63–2 U.S.T.C. par. 9678), but in that case, the regulations were not considered. In light of the holding of this Court in *William C. Heinemann & Co.*, *supra*, and the regulatory provision that a mortgagee is to recognize gain or loss at the time of a foreclosure sale (sec. 1.166–6(b)(1)), we conclude that the respondent's authorities are inapplicable.

Paragraph (b)(2) of section 1.166–6, Income Tax Regs., provides

that the fair market value of the property acquired at a foreclosure sale "shall, in the absence of clear and convincing proof to the contrary, be presumed to be the amount for which it is bid in by the taxpayer." The validity of this provision of the regulations has not been challenged, but the parties do disagree as to its consequences. In our opinion, the regulation imposes upon the petitioner the burden of showing, by clear and convincing evidence, that the amount paid at the foreclosure sale does not represent the fair market value of the property so acquired. However, once the petitioner has shown by clear and convincing evidence that the fair market value of the property is something other than the bid price, it need establish what was the actual fair market value of the property only in the manner ordinarily imposed upon the petitioner in a case before this Court, that is, by a preponderance of the evidence. See *United States* v. *Lease*, 346 F. 2d 696 (C.A. 2, 1965) ; *S. W. Pike Seedsman, Inc.*, 42 B.T.A. 751, 753 (1940) ; 9 Mertens, Law of Federal Income Taxation, sec. 50.62 (1971).

Fair market value has been judicially defined as the "price at which a willing buyer and a willing seller would arrive, after negotiation for sale, where neither is acting under compulsion." *Williams Estate* v. *Commissioner*, 256 F. 2d 217, 218 (C.A. 9, 1958), affirming a Memorandum Opinion of this Court; see *Elmhurst Cemetery Co.* v. *Commissioner*, 300 U.S. 37 (1937). We agree with the petitioner that the factors which the willing buyer and willing seller would consider in arriving at a price for an uncompleted apartment include the estimated value of the apartment when completed, the estimated cost of completion, and, due to the risks and uncertainties that are involved in completing an apartment building, a profit or contingency allowance for the buyer. Obviously, there are very few uncompleted apartment projects placed on the market for sale so that evidence as to comparable sales is not available. Similarily, there can be no capitalization of income when the apartments are not yet ready to produce income. Under these circumstances, we think that the method of valuation proposed by the petitioner provides the most reliable results.

We reject the contention of the respondent that the value of these uncompleted apartments should be computed on the basis of the amounts which had been spent before the valuation date in constructing the structures. Although reproduction costs may be a valid method to be considered in computing the fair market value of a completed building, it is not helpful in this case to compute the value of an uncompleted apartment building which is not yet fit for occupancy. Some of the value of the work that had been done was lost as a result of the damage done by the weather and by vandals. Moreover, the

value of these buildings was not dependent on how much money had been expended previously on their construction, but on how much must be spent to complete it and make it ready for occupancy. Thus, in determining the fair market value of the uncompleted Tacoma Mall and Terri Ann, we will subtract from the estimated value of the apartments when completed the estimated cost of completion and a profit or contingency allowance.

Although the evidence as to the actual value of Tacoma Mall reflects some differences of opinion, it does clearly and convincingly prove that such value was significantly lower than the price bid for that property at the foreclosure sale. The amount of such bid was $435,871.69. Yet, the expert witness testified that Tacoma Mall had a value of $71,500 at the time of the sale. The president of the petitioner at various times estimated the value to be from $75,000 to $200,-000; another employee of the petitioner, in attempting to justify an offering price, estimated the value to be $190,000; and two of the potential redemptioners testified that the bid price was not related to the fair market value. The lawyer, who advised the petitioner in the matter, determined the amount to be bid on the basis of giving the petitioner the maximum protection for the work to be done in completing the building; his determination was not at all based upon the fair market value of the property.

Similarly, the petitioner has shown by clear and convincing evidence that the fair market value of Terri Ann was significantly lower than its bid price. The amount of such bid was $272,196.62. However, such amount was bid to give the petitioner maximum protection in completing the building. The expert witness valued the property at $120,000, the president of Terri Ann estimated the value to be around $100,000, the president of the petitioner estimated the value to be between $75,000 and $100,000, and office memorandums of the petitioner estimated the value to be between $165,000 and $195,000.

Having determined that each bid price did not reflect the fair market value of the property involved, we must now carefully consider all the available evidence and ascertain a value for Tacoma Mall and a value for Terri Ann.

We will first examine the evidence concerning the value of Tacoma Mall at the time of the sheriff's sale. Mr. Shorett, the petitioner's expert witness, used three methods in computing, as of April 15, 1966, the value of Tacoma Mall when completed. Using the reproduction cost approach, he arrived at a figure of $523,000; the market data approach yielded a figure of $525,000; and the income capitalization approach, $510,000. Based on his experience, Mr. Shorett concluded that the market data approach was the most accurate and that the

estimated value of Tacoma Mall when completed was, as of April 15, 1966, $525,000.

The respondent accepts such value, but the petitioner challenges the conclusion of his own expert witness and requests that we find $450,000 to be the value. However, the petitioner challenges neither the method nor the figures upon which the $525,000 appraisal was based. Rather, the petitioner bases his request on the testimony of Mr. Horne, the president of the second mortgagee, who estimated the value of a completed 48-unit Tacoma Mall to be between $450,000 and $475,000, as of April 1966; the fact that Mr. Shulman first offered $450,000 for the property when completed and then bought it in January 1967 for $525,000 only after he was given an option to sell the property back for $535,000; and the offers to purchase for $425,000 to $462,500 which were made to Mr. Shulman in late 1967. Yet, no basis is given for Mr. Horne's opinion, and therefore, it can be given little weight. Although Mr. Shulman's actions might indicate that he did not believe that the completed property was worth $525,000, it cannot be said that both a willing buyer and a willing seller came to that conclusion. The petitioner was not a willing seller since it felt it had to sell the property before its impending liquidation. The offers to purchase, 18 months after the valuation, represent only what buyers were willing to pay and are of little value in this case. Similarly, the petitioner's offers to sell for $550,000 in December 1966 and for $600,000 in January 1967 reflect merely the seller's offering prices and are of little significance. After carefully considering all the evidence, we find most persuasive the valuation of Mr. Shorett, which was based upon a careful analysis, and with respect to which no errors in either his method or facts have been shown, and accordingly, we hold that the fair market value of Tacoma Mall when completed, as of April 15, 1966, was $525,000.

From the $525,000 value must be subtracted the costs which, on April 15, 1966, a reasonable man with a reasonable knowledge of the circumstances would have expected to incur in completing Tacoma Mall. In his computations Mr. Shorett used the actual costs which were incurred in completing the project.

In June 1966, Mr. Simone estimated that it would cost approximately $324,000 to complete the construction of Tacoma Mall, and this estimate would not have been substantially different if it had been made the previous April. However, the estimate obviously was not intended to include all of the costs of completing Tacoma Mall. For example, it did not include attorney fees, sales and real estate taxes, insurance, and furniture. Nor did that estimate take account of the likelihood of change orders. One would expect that in the course

of completing the work on Tacoma Mall, the need for some changes in the plans would be recognized and that there would be change orders, and any attempt to estimate the total costs of completing Tacoma Mall would take that likelihood into consideration. The actual amount spent for change orders was not in excess of what one would reasonably have estimated, and Mr. Shorett's report indicates that the building was completed in substantial conformance with the architectural plans as they existed at the time of the sheriff's sale. Also, although there may have been some inflation in the costs of construction between April 1966 and the time the work was performed, that possibility would also have been included in any reasonable estimate made in April of 1966. Thus, it appears that the costs that were actually incurred in completing Tacoma Mall were all within the realm of what might have reasonably been anticipated, and therefore, we conclude that it was proper to use such costs in computing the value of Tacoma Mall as of April 1966.

In making his valuation, Mr. Shorett assumed that the buyer would borrow the money to complete the building. We believe that this is a proper assumption and agree with the conclusion that interest on this borrowed money should be included as a cost of completing Tacoma Mall. Mr. Shorett also subtracted from the value of Tacoma Mall a "developer's profit" equal to 10 percent of the costs which would be incurred in completing Tacoma Mall. This profit apparently was intended to account for contingencies in the apartment rental industry and to provide an economic incentive for one to buy the uncompleted building. Although we believe that a buyer would require some amount as a developer's profit, we do not believe that he would require an amount equal to approximately 40 percent of his investment. A more appropriate figure would be 10 percent of the amount invested by the buyer. We, therefore, find that the fair market value of Tacoma Mall on April 15, 1966, was $101,670.

We will now examine the evidence concerning the value of Terri Ann as of February 18, 1966. Mr. Shorett, again as in the case of Tacoma Mall, used the three standard methods of valuing a completed building. He concluded that as of the valuation date, the value of Terri Ann when completed was $345,000. In the same year as the sheriff's sale, another appraiser, who did not do a full appraisal, estimated the value to be $335,000, and a realtor estimated the value to be between $335,000 and $350,000. The property was being offered for sale in 1966 at $360,000 when completed, and an appraisal by an employee of the petitioner, which was used to justify this offering price, placed the value at $365,000. Other office memorandums of the petitioner placed the value at $310,000 to $360,000. In November 1966, the peti-

tioner received offers to purchase the property for $350,000 with a $50,000 downpayment, $365,000 with a $50,000 downpayment, and $350,000 with a $65,000 downpayment. Here, too, we were impressed by Mr. Shorett's careful analysis, and nothing has suggested any mistakes in his approach or facts. Moreover, all the indicia of value come to the same approximate result. Accordingly, we find that, as of February 18, 1966, the fair market value of Terri Ann when completed was $345,000.

From the $345,000 value must be subtracted the costs which, on February 18, 1966, a reasonable man with a reasonable knowledge of the circumstances would have expected to incur in completing Terri Ann. In his computations, Mr. Shorett used the actual costs of completing the building.

Mr. Simone's bid of over $149,000 for the completion of the construction of Terri Ann expressly did not include sales tax or any costs which might be incurred in repairing damage that had occurred to the uncompleted building. As in the case of Tacoma Mall, Mr. Simone's bid did not cover all the anticipated costs of completing the apartment project. The actual costs did not exceed what might reasonably have been expected in February of 1966. Accordingly, we hold that the actual costs of completing the project may be used in determining the value of Terri Ann at the time of the foreclosure sale.

As in the instance of Tacoma Mall, we believe that it is proper to assume that a buyer would borrow the money to complete the project and that interest on such money must be considered as an additional cost. We also believe that the buyer would require a developer's profit equal to 10 percent of his investment. We, therefore, hold that the fair market value of Terri Ann on February 18, 1966, was $126,984.

*Decision will be entered under Rule 50.*