T.C. Memo. 2001-92


UNITED STATES TAX COURT


ESTATE OF MARY B. BULL, DECEASED, JOHN N. EDDY AND THOMAS R.
EDDY, CO-EXECUTORS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4908-99.                    Filed April 13, 2001.


Karen L. Hawkins, for petitioner.

G. Michelle Ferreira, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  Respondent determined an estate tax deficiency in the amount of $347,219, all of which is in dispute. The following three issues are in controversy:  (1) Whether the reported value of a partially completed personal residence should be increased to reflect its value if completed because of the possibility of insurance recovery or reimbursement; (2) whether,

in connection with the same residence, the gross estate should include possible future recovery from insurance and/or whether it should be reduced by possible future costs of reconstruction of a partially completed residence; and (3) whether the gross estate should be increased by $88,506 attributable to a postdeath insurance recovery received by the estate.

## FINDINGS OF FACT[1]

At the time of the filing of the petition, Mary B. Bull's estate was being administered in Martinez, California. The coexecutors, at the time of the filing of the petition, resided in Garland, Texas. Mary B. Bull (decedent), who died on November 4, 1994, was the sole owner of residential real property located at 5945 Manchester Drive, Oakland, California. On October 20, 1991, the Manchester Drive residence and its contents were completely destroyed in a natural disaster commonly known as the "Oakland Hills fire".

Decedent maintained insurance on the Manchester Drive property and its contents with the Chubb Group of Insurance Companies (Chubb), under a policy effective June 16, 1991. The policy limits, which were subject to an inflation provision, provided for coverage of $283,000 on the dwelling and $141,500 on the contents. Under the terms of the policy, the coverage would

---

[1] The parties' stipulation of facts is incorporated by this reference.

increase to account for postissuance inflation. The policy also provided for extended replacement cost. The extended replacement coverage, however, was limited to 50 percent of the policy's coverage limits. Replacement was an alternative option and could not be claimed in addition to damage recovery. In the latter part of 1991, after its adjusters examined the property, Chubb paid decedent $478,939.25. That payment represented the maximum possible recovery for loss of decedent's dwelling and/or its contents under the terms of the policy, as adjusted for inflation.

Within 6 months after the fire, reportedly under pressure from the California State Insurance Commissioner, the insurance industry (including Chubb) unilaterally agreed, in connection with the Oakland Hills fire, to disregard the 50-percent cap[2] on replacement costs, and to pay the actual cost of replacement, even if that cost exceeded the policy limits. That change in approach occurred after Chubb had paid decedent the maximum recovery possible under the terms of the policy.

After Chubb unilaterally offered to pay an amount in excess of its obligations for replacement under the policy, decedent invited a bid for construction of a replacement residence from Krueger Brothers Builders, Inc. (Krueger). Krueger's initial bid

---

[2] Apparently, the 50-percent cap on replacement was a policy refinement that was employed in decedent's geographical area.

to restore the dwelling was $1,016,211.69, which included the cost of an architect and building code upgrades. A Chubb claims specialist estimated that the cost of rebuilding other structures (e.g., retaining walls, driveway, and patio) would be $129,413.11. During August 1992, Chubb and decedent entered into a "Settlement Statement and Agreement to Rebuild At Same Location (Subject to The Terms and Conditions of the Policy)". Under that document, decedent made the choice to reconstruct or restore her residence, and Chubb undertook the commitment to reimburse decedent for the restoration in an amount up to $1,299,346.94. Chubb's obligation under the agreement, however, was subject to change (would be less) if decedent "[decided] not to replace part of the building or other structures or if the cost of * * * construction is less" than estimated. Chubb withheld a portion of any amount due under the agreement to ensure compliance with decedent's agreement to reconstruct. The agreement called for release of reimbursement payments by Chubb in an incremental manner: One-third upon execution of the agreement, one-third when the architect and/or contractor advised Chubb that the framing was completed, and one-third when presented with a notice of occupancy by the city.

During the summer of 1993, decedent entered into an agreement with Krueger to build a replacement residence on the Manchester Drive land for a projected estimated price of

$1,270,658, which included construction of a single family dwelling, foundation, and site improvement work.  The terms of the construction contract required certification by decedent's architect before progress payments and/or change orders could be made.  Chubb reviewed the architect's certifications and any accountings by Krueger.  Chubb used the information from these materials as a basis for preparing "Statements of Loss", the enabling document preceding reimbursement to decedent.

Although Chubb paid reimbursement proceeds directly to decedent, Krueger performed the renovations based on its expectation of Chubb's reimbursement of decedent.  Chubb made payment only after receipt of verification that work had been performed and accounted for by Krueger.  Chubb also made payments to decedent for living expenses while the residence was being rebuilt.

Prior to her November 4, 1994, death, decedent received payments totaling $1,663,102 from Chubb, which Chubb characterized as follows:

| For | 1991 | 1992 | 1993 | 1994 |
|---|---|---|---|---|
| Living expenses | $25,000.00 | $53,616.14 | $45,537.38 | $22,984.69 |
| Debris removal | 3,709.00 | 25,821.00 | --- | --- |
| Land stabilization | --- | 21,161.25 | 5,799.23 | 15,627.00 |
| Landscaping | 14,362.25 | 20,637.75 | --- | --- |
| code Upgrades | --- | 16,312.41 | 42,261.53 | --- |
| Other structures | 5,000.00 | 129,413.11 | --- | --- |
| Building contents | [1]143,623.00 | --- | 430,138.59 | --- |
| Building reconstruction | [1]287,245.00 | 264,735.72 | 90,117.01 | --- |
| Total | 478,939.25 | 531,697.38 | 613,853.74 | 38,611.69 |

[1] These amounts were paid by Chubb in 1991 as payment in full of the inflation indexed policy limits and were not originally designated for rebuilding of the residence.

As of September 1994, Krueger increased the total projected cost to complete the residence from $1,270,658 to $1,654,348. As of November 2, 1994, Krueger estimated that the completion of the residence construction would cost $757,174.24. As of May 31, 1997 when the residence was completed, a total of $1,759,509.65 had been paid to Krueger.

After decedent's death, her nephews, John and Thomas Eddy, became coexecutors and primary beneficiaries of the estate, and, ultimately, they decided to complete the reconstruction of the residence. During the summer of 1995, John and Thomas Eddy had a disagreement about whether the residence should be completed. An attorney was engaged to negotiate a resolution, and an agreement was reached about 1 year later. The agreement provided that: (1) No more than $44,000 would be paid for landscaping, with any

amount in excess being paid by Thomas; (2) for purposes of the agreement, the value of the residence was to be $750,000; and (3) the residence would be distributed to Thomas, and John would receive other assets valued at $375,000 (representing one-half the value of the residence). During 1995, Chubb paid a total of $1,122,606 to decedent's estate, which was characterized by Chubb as being for the following purposes: Landscaping $19,200.53, code upgrades $124,859.55, building $890,039.89, and contents $88,506.17. After decedent's death, the estate paid $1,030,378.44 to Krueger.

Prior to the completion of the residence, the county government assessed it as new construction property with an assessment value of $806,175 for the 1995-96 tax year and $836,275 for the 1996-97 tax year. The gross estate included $732,773 as an amount due from Chubb as potential reimbursement after the completion of the restoration. The gross estate was reduced by $795,440 and $53,075, or a total of $848,515, representing the amount that would be due to Krueger if it was decided to proceed with construction to restore the residence and Krueger completed the work.

An appraisal attached to the estate tax return reflected the value of the partially (57 percent) constructed residence at $612,000, the amount that was included in the gross estate. Many of the homes that were rebuilt after the Oakland Hills fire were

"overbuilt" in that restoration costs exceeded the completed home's fair market value. The insurance companies' unilateral agreement to reimburse policyholders for restoration of residences, even though the costs exceeded their policy obligations, was, in great part, responsible for restoration costs that exceeded the completed market value of the residences.

On August 22, 1996, the coexecutors petitioned the probate court for and received a waiver to permit distribution of the rebuilt residence to Thomas at the previously agreed value of $750,000. Thomas, on December 17, 1996, entered into an exclusive listing with a real estate agent to place the residence on the market for an asking price of $995,000. Ultimately, the residence was sold for $1,030,000 on March 18, 1997.

OPINION

Decedent's home was destroyed by fire and was being restored at the time of her death. Her estate, relying on an appraisal, included $612,000 in the gross estate as the fair market value of the residence, which was 57 percent complete. Also included in the gross estate was an amount exceeding $700,000 that the estate estimated would be due from the insurance carrier for future reimbursement upon completion of the restoration of the residence. Finally, the gross estate was reduced by an amount exceeding $800,000 that the estate estimated would be due to the contractor, if the construction of the residence was completed.

In effect, the amounts estimated as being due to the contractor and due to the estate from the insurance company resulted in a net reduction of approximately $120,000 in the gross estate. Considering the $612,000 inclusion and reduction of approximately $120,000, the gross estate was increased by a net amount of approximately $490,000 in connection with decedent's interest in the partially completed residence.

With respect to the $612,000 amount, respondent determined that the value of the residence, as completed, should be includable in the gross estate. Based on the $1,032,000 completed value set forth in the appraisal attached to the estate tax return, respondent determined that the gross estate should be increased by $420,000 ($1,032,000 less the $612,000 already included)[3]. Respondent argues that the $420,000 increase reflects decedent's right to receive reimbursement from the insurance company for the completion of the residence.

Respondent also determined that the gross estate should be increased by $122,400,[4] representing the excess of the estimated amounts that may be due to the contractor over the estimated

---

[3] A more complete discussion of how the $612,000 value was computed appears infra pp. 13-14.

[4] We have referred to this difference as an "approximate" amount because it is not clear in the record how the $122,400 amount was calculated. In any event, the parties only argue about whether the $122,400 adjustment should be sustained and not about the stated amount.

amount that may be due from the insurance company.  The notice of deficiency contained the following explanation for disallowing the $122,400 adjustment:  "It is determined that the estate took a $855,573 deduction for outstanding monies owed to the contractors.  Since the insurance was to pay for the entire cost of rebuilding, the estate cannot deduct more than it returns as an asset."  In effect, respondent's approach results in a net amount of $1,032,000 being included in the gross estate with respect to the partially completed residence.

We disagree with the approach utilized by both parties.  We do not question the legal principles relied upon by either party, but question their interpretation and application of those principles to the facts.  We first review the legal principles.

For Federal estate tax purposes, assets are includable in a decedent's gross estate at fair market value determined at the date of death.  See sec. 2031(a);[5] sec. 20.2031-1(b), Estate Tax Regs.  Fair market value is "'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'"  United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting sec. 20.2031-

---

[5] All section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

1(b), Estate Tax Regs.); <u>Estate of Hall v. Commissioner</u>, 92 T.C. 312, 335 (1989). Fair market value is tested on an objective basis using a hypothetical buyer and seller and not on the basis of particular entities or individuals involved. See <u>Estate of Andrews v. Commissioner</u>, 79 T.C. 938, 956 (1982); <u>Estate of Bright v. United States</u>, 658 F.2d 999, 1005-1006 (5th Cir. 1981).

The circumstances here are unconventional in several respects. Firstly, the asset in question was incomplete and under construction at the time of death. More significantly, the residence was to be restored to its prefire specifications. As we understand that concept, the cost of restoring the destroyed residence to its original vintage condition was substantially greater than the per-square-foot cost of constructing a contemporary home. In other words, there was no compulsion for the construction costs to be within boundaries that comport with resale value. That anomaly resulted in circumstances where more was being expended for construction and restoration than could possibly be realized if the structure were sold upon completion. The facts here reflect that the fair market value of the finished residence was substantially less than the cost of restoration.

Finally, although the insurance company's obligation was contractually and legally limited to the payment of up to one-half of the stated policy limit if the residence was rebuilt, the insurance company unilaterally agreed to bear the cost of

replacement of the vintage structure and to pay decedent's living expenses during the interim. The insurance company's agreement to pay, however, was contingent upon decedent's pursuit and completion of restoration and unique to decedent. Ultimately, that agreement resulted in the insurance company's paying almost $2.8 million in connection with the restoration of a house that was insured for coverage of $283,000 on the dwelling and only 50 percent of $283,000, if the insured chose to rebuild. Of the $2.8 million paid, less than $200,000 was paid for living expenses and removal of the debris caused by the fire. The remainder of the $2.8 million was reimbursement for restoring the residence, landscaping, and building contents.

We cannot rely on these expenditures for purposes of valuation. Considering the fact that about 3 years after decedent's death, the residence was sold at arm's length for slightly over $1 million, the expenditures have no rational relationship to the value. In a similar vein, at the time of decedent's death the estimated "completed value" of the residence was an amount approaching $1 million, whereas at the time of death, a willing buyer would not have offered the completed price.

Conventional approaches to valuation, inclusion of assets, and reduction of the estate for decedent's obligations do not accurately address these peculiar circumstances. The estate's

approach of estimating the cost to complete and the reimbursement
of part of that cost have no meaningful relationship to
decedent's asset--the partially completed residence.  At the date
of death, the estate had no right to receive insurance
reimbursement and no obligation to pay for the completion of the
residence.  For that reason, we sustain respondent's
determination that the gross estate be increased by $122,400[6].

Next, we consider respondent's determination that the
incomplete residence should be valued by considering its value if
finished.  From respondent's perspective, decedent had a contract
right or chose in action that was worth, at very least, the
difference between the incomplete structure and its ultimate
selling value.  The estate reported the value of the incomplete
structure at $612,000, the value set forth in the appraisal
attached to the estate's return.  The appraisal utilized a cost-
per-square-foot approach to project the completed value of the
then 57-percent completed residence at $1,032,000.
Appropriately, the appraiser's cost approach did not rely on the
actual cost, which was more than the cost to build a contemporary
residence and did not comport with fair market values of
comparable residences.  The appraiser's valuation was

---

[6] The $122,400 increase in the gross estate is a net result
of the disallowance of the amount claimed as due to the
residential contractor and the removal from the gross estate of
the amount included as possible recovery from the insurance
company.

corroborated by means of contemporaneous sales of four comparable properties. The land was valued at $215,000 and the 57-percent completed building at $465,690 ($817,000 times 57 percent) for a total of $680,690. A 10-percent marketability discount ($68,690) was used to reflect the incomplete status of the residence to arrive at an appraised value of $612,000. Respondent's notice determination utilized the appraiser's $1,032,000 completed value to determine that the gross estate should be increased by $420,000 ($1,032,000 less the $612,000 reported).

At trial, the estate offered an expert who concluded that the value of the residence, if it had been completed on November 4, 1994, would have been $900,000. The trial expert explained that the cost method was usually a good measure of value, but that it was not a reliable measure of value with respect to the actual cost of restoring the Manchester Drive property because the costs were excessive. The expert reached that conclusion because the actual construction costs were not "recoverable in the marketplace", due to "the abnormal post fire construction environment and the high quality of workmanship". He also concluded that the income method was inappropriate, so that a sales comparison approach was the only relevant way to measure value. Five comparable contemporaneous sales of property were used to reach the $900,000 value if completed.

We do not place much reliance on the estate's trial expert's departure from the cost approach that had been used by the appraiser, whose report was attached to the estate tax return. The appraisal attached to the estate tax return used a contemporaneous cost-per-square-foot approach to determining value, not the peculiar cost of the Manchester Drive residence. Based on the use of the cost method, a $1,032,000 value was placed on the completed residence, a value that was only $2,000 more that the eventual arm's-length selling price. Moreover, respondent has not questioned the credibility of the appraisal attached to the return. Respondent appears to accept $612,000 as being the value of the 57-percent completed residence on November 4, 1994. The Court also accepts that value as the amount that should have been included in decedent's gross estate.

Respondent, however, contends that the value should be increased to reflect the completed value of the residence because the insurance company agreed to reimburse decedent for rebuilding the residence. The estate argues that decedent did not own any asset, contract right, or chose in action that would enhance the value of the incomplete residence at the time of her death. We agree with the estate.

The concept of fair market value, in the context of Federal taxation, has remained unchanged for more than 80 years. For estate tax purposes, the amount includable in the gross estate is

the fair market value of decedent's interest in an asset on the date of death. Here decedent owned an incomplete residence (57-percent completed). The parties' disputes, however, focus on the intangible aspects connected with the possible completion of the residence.

Respondent does not argue that cost should be the measure of the value of the partially or fully completed asset. On this point also see Securities Mortg. Co. v. Commissioner, 58 T.C. 667, 675 (1972), where cost was not used to value incomplete realty. Respondent's determination is that decedent had a right or was entitled to the completion of the residence so that the completed value should have been included in the gross estate. Accordingly, respondent's position is that decedent had a right to the insurance reimbursement, and the value of that right was includable as an asset in her estate.

Under the agreement between Chubb and decedent, Chubb had unilaterally agreed to pay for restoration of the residence, but only if restoration was pursued and completed. To the extent that Chubb had an obligation to decedent at the time of her death, it could only be to reimburse for any portion of the residence that had been restored. In addition, Chubb's exposure under the agreement was to be reduced if the cost of construction was less than estimated.

At the time of decedent's death, it appears that neither decedent nor her heirs had any enforceable right to payments from Chubb. Chubb had no outstanding debt or obligation to decedent or her heirs. Additionally, because the construction contract ran between decedent and Krueger and was not with her executors or heirs, at the time of death there was no assurance Krueger would complete the project.[7] The parties' actions in connection with the rebuilding of the residence reveal an informal arrangement between Chubb, the coexecutors, and Krueger under which, Krueger completed construction on the expectation of payment from the insurance reimbursement. Chubb, however, would not reimburse decedent or the coexecutors unless or until the restoration had been completed. Chubb's postdeath payments were not made until additional work was accounted for and verified. Under these circumstances, Chubb's obligation to pay for improvements after decedent's death was subject to a condition precedent.

Because of the lack of contractual rights by the estate and/or the heirs to payment from Chubb or performance by Krueger, the practical reality was, that after decedent's death, there

---

[7] We also note that more was being expended to complete the residence than could be recovered from a sale of the completed residence. Under those circumstances, it would have been to Krueger's financial detriment to incur the cost of labor and materials without assurances and commitments from the heirs, executors and/or the insurance company.

existed a 57-percent complete residence with no enforceable right to insurance reimbursement and no contractual obligation between the estate or heirs and Krueger for the completion of construction. Under these circumstances no amount was includable in decedent's gross estate to represent any possible future payment from Chubb.

The situation here is unlike those where services have been performed and/or an asset exchanged and something was due to or from decedent at the time of death. See, e.g., Estate of Curry v. Commissioner, 74 T.C. 540, 545-547 (1980), where a contingent legal fee was includable in an estate based on the rationale that it had been earned and a claim existed at the time of death.

Chubb's obligation to pay is conditional and did not arise or exist until after decedent's death. Stated another way, decedent did not have a right, at the time of her death, to receive reimbursement from Chubb until and unless the restoration was accomplished triggering Chubb's obligation. See also Estate of Rowan v. Commissioner, 54 T.C. 633, 640 (1970), where crops had been produced, sold, and delivered prior to death so that there was a right to receive payment that was includable in that estate.

Another significant reason for our holding is that the reimbursement payments, if made, had no rational relationship to the value of the completed residence or asset. Any such payments

were to be reimbursement for costs of construction that had been completed. Respondent's determination was that the estate should not be allowed to claim more than $800,000 in future obligations to the contractor for an asset (the residence) that is valued at $612,000 for estate tax purposes. Respondent's logic is equally applicable to the inclusion of possible insurance reimbursement where it has no meaningful relationship to the fair market value of an includable asset. Ultimately, the transfer tax should reach the net value of decedent's assets, and the cost and reimbursement amounts in the setting of this case do not provide a basis to calculate that value.

Conceptually, the purpose of the estate tax is to tax the transmission of wealth at death. See United States v. Stapf, 375 U.S. 118, 134 (1963). Section 2031 is intended to provide for inclusion of a decedent's interests transferred at death. Likewise, section 2053(a) was intended to ensure that only the net estate; i.e., that which is available for distribution to the beneficiaries, is taxed. See Hibernia Bank v. United States, 581 F.2d 741, 746 (9th Cir. 1978).

In this case, the asset available for distribution to the beneficiaries was the 57-percent completed residence. The beneficiaries had the option to complete the residence and thereby incur benefits and burdens of such action. The fair market value of the asset received by the beneficiaries, however,

was no more or less than the $612,000 fair market value of the incomplete residence.

Accordingly, we hold that the fair market value of the residence at decedent's death was $612,000, as reported by the estate. We also hold that the estate is not entitled to deduct the possibility of future obligations to Krueger or required to include the possibility of reimbursements from Chubb. The effect of our holdings is a net increase of $122,400 to the gross estate.

The last issue we must consider is whether the estate failed to include in the gross estate the amount of $88,506 that respondent concluded was equal to the value of reimbursement for household furnishings lost in the fire. Respondent reaches the conclusion that the estate failed to report the value of household furnishings. The record shows that Chubb paid decedent $573,761.59 prior to her death, and that amount, according to the terms of the policy, was, in part, for the contents lost in the fire. Respondent became aware of an $88,506 amount subsequently received by the estate as part of a larger insurance reimbursement payment. The $88,506 amount had been labeled and characterized by Chubb as for "contents". Respondent has concluded that Chubb's labeling part of the payment as "contents"

indicates that it was for the reimbursement of lost furnishings (personal property).[8]

The estate argues that inclusion of $88,506 in the gross estate would, in effect, result in double counting. That is so because decedent was paid the policy limits prior to her death, which included $142,915 for household contents. At the time of death, decedent had received reimbursement from the insurance company in an amount that exceeded the insurance company's maximum liability to pay for the loss of "contents". To the extent that predeath reimbursement was used to pay for restoration, it would have been reflected in the value of the partially completed residence. To the extent that predeath reimbursement was used to pay for furnishings, they would have been scheduled as assets on the estate tax return. To the extent that any reimbursement or payment received in connection with the insurance policy had not been used, it would be reflected as part of decedent's liquid assets (cash) that was included in the gross estate.

Respondent's approach of anticipating the possible existence of household furnishings based on events occurring subsequent to decedent's death and that were not known at the time of

---

[8] Based on the record and in the context of this case, there is no way to know with certainty the meaning of the term "contents" or whether decedent was owed $88,506 at the time of her death for the loss of personal property.

decedent's death cannot be sustained.  The insurance company had already exceeded its obligations to make payments to decedent under the existing policy.  To the extent that any other payments were made to decedent's estate or heirs, there is no indication that the insurance company was legally obligated to make them or that decedent had a right to such payments at the time of her death.  Accordingly, we hold that respondent has erred in determining that the gross estate should be increased $88,506 for household furnishings of decedent.

The estate raised the issue of the estate's entitlement to fees and costs incurred for legal and accounting provided during the pendency of this tax controversy.  Respondent conceded that the estate would be entitled to legal and professional fees to the extent the estate can substantiate such costs under the Internal Revenue Code.  We therefore leave this item to the parties' computations under Rule 155.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.